NOT DESIGNATED FOR PUBLICATION

No. 115,809

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CURTIS W. DROWN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed August 11, 2017. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., STANDRIDGE and SCHROEDER, JJ.

*Per Curiam*: Curtis W. Drown pled guilty to two counts of aggravated sexual solicitation and one count of attempted rape. Prior to sentencing, Drown filed a motion to withdraw his plea. Following an evidentiary hearing, the district court denied his motion. Drown appeals, arguing that the district court erred in denying his motion to withdraw his plea of guilty.

FACTS

In January 2014, the State charged Drown with three counts of aggravated indecent liberties with a child, with each count constituting an off-grid person felony with a potential sentence of 25 years to life. See K.S.A. 2016 Supp. 21-5506(c)(3).

Drown eventually accepted a plea agreement. Under the plea agreement, the State filed an amended complaint charging Drown with two counts of aggravated indecent solicitation of a child and one count of attempted rape. Drown agreed to plead guilty to the charges in the amended complaint, while the State agreed to recommend the high number in the appropriate sentencing guidelines gridbox for each count and to recommend that the attempted rape count run consecutive to one of the aggravated indecent solicitation counts, with the remaining aggravated indecent solicitation count to run concurrently.

Before the plea hearing, Drown signed a form titled "Defendant's Acknowledgment of Rights and Entry of Plea." In the form, Drown acknowledged that he had fully discussed the plea agreement with his attorney and understood the plea agreement, the charges against him, and the penalties he faced. Drown also acknowledged that he had read the form, that he understood the rights to which he was entitled and the rights he was giving up, and that he was accepting the terms and conditions of the plea agreement.

At the plea hearing, Drown stated that he was 25 years old, had completed 10th grade, and had no problems or difficulties reading, writing, or understanding English. Drown acknowledged that he had read the plea agreement, he had read the acknowledgment of rights and entry of plea form, he understood all the rights and options contained in the documents, and he had personally signed the documents. The district court then proceeded to orally explain the rights, choices, and options Drown was giving

up by pleading guilty. Drown again stated that he understood his rights, choices, and options and that he had no questions for his attorney about them. Drown also expressed an understanding of the plea agreement and the potential sentence he faced for each count to which he was entering a plea of guilty. Drown confirmed there had been no promises or threats made in order to get him to enter the plea and denied he had any mental problems or taken any drugs or medications that might affect his ability to understand his rights or the consequences of his plea. Drown agreed that he had sufficient time to discuss his legal rights and options with his attorney, that he had been satisfied with his attorney's services, that he fully understood his legal rights and options and the consequences of his guilty plea to the charges in the case, and that he had no further questions about any of the rights, choices, or options available to him. The court found that Drown understood the charges against him and the consequences of his guilty pleas, that he understood his rights, and that he waived those rights knowingly, intelligently, and voluntarily. Thereafter, Drown pled guilty to the charges set forth in the State's amended complaint.

After this plea hearing but before his scheduled sentencing hearing, Drown engaged new counsel and filed a motion to withdraw his plea of guilty. In the motion, Drown claimed that (1) his plea attorney failed to advocate on his behalf, (2) he was coerced into accepting the plea, and (3) the plea was not fairly or understandingly made. The district court conducted an evidentiary hearing on the motion to withdraw plea and heard testimony from the following witnesses.

*Curtis W. Drown*

Drown testified that he had retained Chris O'Hara to represent him shortly after the State filed charges against him. Drown said he told O'Hara from the beginning that he wanted to go to trial and did not want to take a plea deal because he was innocent of the crimes. Drown testified he only met with O'Hara about four times, that each visit was

3

relatively short, and that O'Hara rarely communicated with him or his family and was not very responsive when they tried to get ahold of him. Drown claimed he gave O'Hara a list of witnesses who were present on the night of the alleged crimes, but he did not know if O'Hara ever contacted them. Drown further claimed O'Hara was not adequately focused on his case as evidenced by the fact that O'Hara did not respond or provide any information when asked and never elaborated on what his defense would be at trial. Drown did not feel that O'Hara was ready to go to trial or that O'Hara wanted to put in the work necessary to take the case to trial.

According to Drown, O'Hara began discussing the possibility of a plea agreement the week before trial. Drown acknowledged he had authorized O'Hara to enter into plea negotiations but said he only would have considered a plea that contemplated a sentence of probation. On the Friday before Monday's scheduled jury trial, O'Hara visited Drown at the jail and presented Drown with a plea offer. Drown said O'Hara discussed the possibility of obtaining another offer with a dispositional downward departure to a guaranteed grid sentence. This offer ultimately was presented to Drown at a plea hearing that took place later that afternoon. Drown testified that O'Hara did not attend the hearing; instead, Kevin Zolotor, an attorney from O'Hara's law firm, represented Drown at the hearing. O'Hara had never met Zolotor and was confused as to why he was there. Drown testified that he only had about 10 minutes to go over the plea documents with Zolotor that afternoon. Drown also testified that his reading comprehension was low and that he often had to read things more than once to understand them. Drown testified it was only after reviewing the plea agreement Friday afternoon that he learned for the first time he was facing lifetime postrelease supervision or lifetime registration. Given this new information, Drown told Zolotor that he did not want to take the plea. Zolotor left the courtroom to call O'Hara, who Drown says pressured him over the phone to take the plea. According to Drown, O'Hara told him that if he were convicted at trial, he would receive a life sentence. Drown said he had to make the decision in a matter of minutes and was not given the opportunity to consult with his family. Drown ultimately pled

4

guilty, and the court engaged in the colloquy set forth above. Drown said he and his family later tried to contact O'Hara about withdrawing the plea, but they never received a response. Drown said he had been advised of the possible consequences if the court granted his request to withdraw his plea but still wanted to do so.

Drown agreed that O'Hara had filed several motions on his behalf and that O'Hara's investigator had interviewed two of the three alleged victims. Drown admitted that during the time O'Hara represented him, he never told the district court he was unhappy with O'Hara, he never asked for or attempted to get a new attorney, and he never indicated he needed more time to discuss the plea agreement. When asked about the representations he made at the plea hearing, Drown testified he had lied to the district court when he expressed satisfaction with the manner in which O'Hara and Zolotor represented him throughout the proceedings.

*Angel Nicholson*

Angel Nicholson, Drown's wife, testified that Drown had not completed high school or obtained a GED. According to Nicholson, Drown usually sought input from his family about major decisions and had difficulty making major or quick decisions on his own. Nicholson said O'Hara never contacted her and he failed to timely respond to her efforts in contacting him. Nicholson said she was never contacted by O'Hara's investigator. Nicholson also said she did not believe O'Hara was prepared to go to trial on the charges against her husband. Nicholson testified that neither she nor Drown's other family members were told about the plea hearing and only learned that Drown had entered a plea of guilty after it happened. Nicholson claimed she attempted to contact O'Hara after the plea hearing to express her concerns, but he did not return her calls or messages.

*Chris O'Hara*

O'Hara testified that he had been an attorney for 11 years and that his practice focused primarily on state and federal criminal defense. O'Hara said Drown's family retained his firm to represent Drown with regard to the charges filed against Drown. O'Hara was Drown's primary attorney, but O'Hara said it was common in his three-person firm for the attorneys to help each other out and cover hearings for each other when necessary, as all attorneys in the firm were experienced in criminal defense work. O'Hara recalled work he performed early on in Drown's case when the State attempted to revoke his bond. O'Hara did not recall how many times he visited Drown in jail but claimed that he spoke with Drown often enough to ensure that Drown knew what was going on in the case. O'Hara said that the crux of the case involved statements made by the alleged victims and that his investigator spoke to the alleged victims. O'Hara also said he interviewed several witnesses who had not been already interviewed by the police.

O'Hara testified that Drown claimed to be innocent of the crimes. O'Hara said that he was planning to go to trial, that he was prepared to do so, and that plea discussions did not come up until near the time of trial. O'Hara testified that he believed Drown eventually directed him to pursue plea negotiations because the trial date was looming, Drown was scared about the possibility of facing three 25-years-to-life sentences, and Drown wanted to see what his options were. The Friday prior to the jury trial scheduled for Monday, O'Hara went to Drown with a proposed plea agreement. In discussing the terms of the plea agreement, it appeared to O'Hara that Drown believed lifetime postrelease supervision was not going to be imposed. Nevertheless, O'Hara said Drown wanted to enter into the plea agreement and expressed no hesitation in telling O'Hara that he wanted to do so. O'Hara said he explained to Drown that the plea hearing would take place that afternoon and that he could not personally be at the plea hearing because he had another hearing in Kansas City. O'Hara told Drown he had arranged for Zolotor, another attorney in his office, to represent Drown at the plea hearing. O'Hara claimed

Drown understood the plea hearing would take place that afternoon and that O'Hara would not be there.

O'Hara explained that Zolotor called him that afternoon based on Drown's concern after reading the provision in the plea agreement reflecting lifetime postrelease supervision. O'Hara testified that he then spoke directly with Drown on the phone, explaining lifetime postrelease supervision was statutorily mandated and was therefore not negotiable within the plea agreement. O'Hara said he made it known that it was up to Drown to decide whether to enter into the plea agreement. Drown then told O'Hara that he was going to accept the plea offer. O'Hara denied Drown's claim that he threatened or forced Drown to take the plea. O'Hara said he told Drown from the beginning that it was Drown's decision whether to accept a plea offer and that he would support whatever decision Drown made. O'Hara testified he had no concerns about Drown understanding the plea agreement or being coerced into entering a plea to the amended charges.

*Kevin Zolotor*

Zolotor testified that he covered Drown's plea hearing for O'Hara, a normal occurrence at the firm. He said he was familiar with Drown's case and had a general understanding of the issues involved. Zolotor understood that Drown had already agreed to the plea and that he was just there to facilitate it. Zolotor said he knew Drown might have questions about the duration of the postrelease supervision term. Zolotor said Drown expressed concern relating to lifetime postrelease supervision when he and Drown discussed the plea agreement, so he called O'Hara to discuss the issue with Drown. After the phone conversation between Drown and O'Hara ended, Zolotor testified Drown went forward with the plea. Zolotor said Drown did not indicate or otherwise express any hesitancy about going forward with the plea pursuant to the terms of the agreement. If Drown had shown any reluctance about going forward, Zolotor said he would have stopped the proceedings.

After considering the evidence presented, the plea hearing transcript, and arguments from counsel, the district court found Drown had failed to establish that he was entitled to relief under any of the factors set forth in *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). In the absence of good cause to justify withdrawing the plea, the court denied Drown's motion. The district court later sentenced Drown to a controlling prison term of 95 months with lifetime postrelease supervision and lifetime offender registration.

ANALYSIS

On appeal, Drown contends the district court erred in denying his motion to withdraw plea. "A plea of guilty or nolo contendere, for good cause shown and within the discretion of the court, may be withdrawn at any time before sentence is adjudged." K.S.A. 2016 Supp. 22-3210(d)(1).

Because granting leave to withdraw a plea prior to sentencing is within the discretion of the district court, a defendant generally has the burden to show on appeal that the district court abused its discretion in denying his or her motion to withdraw plea. See *State v. Kenney*, 299 Kan. 389, 393, 323 P.3d 1288 (2014). Drown asserts that his due process rights are implicated and therefore urges us to abandon the abuse of discretion standard and review this issue de novo. Notably, Drown cites no authority for his claim that a district court's decision to deny a presentence motion to withdraw plea may be subject to unlimited review; thus, we are bound by the standard of review set forth by our Supreme Court. See *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013) (failure to support point with pertinent authority or show why it is sound despite lack of supporting authority or in face of contrary authority is akin to failing to brief issue); *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015) (Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication Supreme Court is departing from its previous position).

8

We review a district court's decision to deny a presentence motion to withdraw a plea for an abuse of discretion. *Kenney*, 299 Kan. at 393. A judicial action constitutes an abuse of discretion if the action is: (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the district court; (2) based on an error of law; or (3) based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). Applying an abuse of discretion standard does not involve reweighing evidence or assessing witness credibility; we defer to district court fact finding in these matters. *State v. Anderson*, 291 Kan. 849, 855, 249 P.3d 425 (2011).

To determine whether a defendant has shown the required "good cause" necessary to withdraw a plea under K.S.A. 2016 Supp. 22-3210(d)(1), a court is guided by the following three factors, commonly referred to as the *Edgar* factors: "(1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made." *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014) (citing *State v. Aguilar*, 290 Kan. 506, 511, 231 P.3d 563 [2010]). But these factors should not be applied mechanically or to the exclusion of other factors. *Fritz*, 299 Kan. at 154. A defendant does not need to establish all three factors in order to demonstrate good cause to withdraw a plea. *State v. Ebaben*, 294 Kan. 807, 812, 281 P.3d 129 (2012). Nevertheless, a defendant's determination, in hindsight, that a plea was not the best course of action, without more, is not sufficient good cause to withdraw the plea. See *State v. Schow*, 287 Kan. 529, 542, 197 P.3d 825 (2008).

Drown claims that all three of the *Edgar* factors are present in his case: (1) he was not represented by competent counsel; (2) he was misled, coerced, and taken advantage of; and (3) his plea was not voluntarily and understandably made.

9

*Represented by competent counsel*

To establish good cause, a defendant need not "demonstrate ineffective assistance arising to the level of a violation of the Sixth Amendment [to the United States Constitution]"; mere "lackluster advocacy . . . may be plenty to support the first *Edgar* factor and thus statutory good cause for presentence withdrawal of a plea." *Aguilar*, 290 Kan. at 512-13. The established minimum standard for reasonable representation by plea counsel, however, is advising the defendant of the range of possible penalties and discussing the choices available to the defendant. *State v. White*, 289 Kan. 279, 285-86, 211 P.3d 805 (2009).

With respect to the first *Edgar* factor, Drown contends that O'Hara provided no meaningful advocacy on his behalf, often failed to communicate with him, was unprepared to go to trial, and did not believe his consistent assertions of innocence. Although conceding O'Hara visited him in jail the morning of his plea, Drown asserts he did not receive a written plea agreement or a written acknowledgment of rights and entry of plea form at that time. Drown also claims he was unaware that O'Hara would not be at the plea hearing that afternoon and complains that he was provided with an attorney who he did not know, who was unfamiliar with the case, and who could not answer his questions.

Drown's claims are not supported by the record. O'Hara testified that he met with Drown on multiple occasions, apprised him of developments in the case, and investigated and interviewed potential witnesses and the alleged victims. O'Hara was aware that Drown claimed to be innocent of the crimes. O'Hara testified that he had planned to go to trial but that Drown had directed him to pursue plea negotiations with the State in the week before trial. Drown was potentially facing three consecutive sentences of 25 years to life in prison, and O'Hara ultimately obtained a plea offer that recommended a significantly lower sentence: 94 months in prison. O'Hara testified that after receiving

10

the final plea offer from the State, he discussed the terms and consequences of the plea with Drown and informed Drown that he could not be present at the plea hearing. According to O'Hara, Drown did not object to Zolotor representing Drown at the plea hearing. O'Hara and Zolotor both testified that Zolotor was familiar with the plea agreement and was aware that the duration of postrelease supervision could be a concern for Drown. When Drown did express concern about this issue, Zolotor contacted O'Hara by phone, who informed Drown that lifetime postrelease supervision was required by statute and could not be negotiated within the plea agreement. Thereafter, Drown informed both O'Hara and Zolotor that he wanted to take the plea.

In addition to the evidence set forth above, Drown himself informed the district court at the plea hearing that he was willing to proceed with Zolotor representing him, that he had read the plea agreement and the acknowledgment of rights and entry of plea form and fully understood the rights and options contained therein, and that he had no questions about any of those rights and options. Drown further expressed an understanding of the sentences he faced on each of the State's amended charges, which included lifetime postrelease supervision. Finally, Drown agreed that he had sufficient time to discuss all his legal rights and options with O'Hara and Zolotor and that he was satisfied with their performance.

The district court made a specific finding that Drown was represented by competent counsel. Based on the record before us, the district court correctly applied the first *Edgar* factor in coming to this conclusion.

*Misled, coerced, mistreated, or unfairly taken advantage of*

In support of the second *Edgar* factor, Drown argues O'Hara coerced him into accepting the plea agreement, despite his claims of innocence and his assertions that he did not want to plead guilty to the crimes. Drown alleges that he felt pressured to accept

11

the plea agreement, based in part on his lack of confidence in O'Hara's ability to represent him at trial.

But Drown affirmed at the time he entered into the plea that he was not coerced or threatened in any way and was not promised anything in exchange for his plea. As previously discussed, it appears that O'Hara was working toward preparing the case for trial. O'Hara testified that he planned to go to trial and denied that he had threatened or forced Drown to take the plea. O'Hara also testified he told Drown that it was his choice whether to accept the plea offer and that he would support Drown's decision.

The district court, relying on O'Hara's testimony, found that Drown was not misled, coerced, mistreated, or unfairly taken advantage of when accepting the plea. This court does not reweigh the credibility of witnesses, so we must give deference to the district court's findings on this point. See *Anderson*, 291 Kan. at 855. Drown's argument under the second *Edgar* factor necessarily fails.

*Plea voluntarily and understandingly made*

Finally, Drown argues he cannot be deemed to have voluntarily and understandingly entered into a plea of guilty to the charges against him because he demonstrated a lack of capacity to comprehend written material, did not complete high school or earn a GED, and had no opportunity to seek advice from his family before making the decision to enter the plea.

But the record does not support Drown's argument. Before entering his plea, Drown reviewed the plea documents and specifically expressed concern about the term of postrelease supervision in the plea agreement. Only after talking to O'Hara on the phone did Drown ultimately sign the acknowledgment of rights and entry of plea form. By doing so, he acknowledged he had fully discussed the plea agreement with his attorney

12

and understood the plea agreement, the charges against him, and the penalties he faced. At the plea hearing itself, Drown responded to specific questions posed by the court regarding his understanding of the plea agreement and the rights he had and was giving up. Drown told the court that he had no problems or difficulties reading, writing, or understanding English. He acknowledged to the court that he had read the plea agreement and the acknowledgement of rights and entry of plea form, understood all the rights and options contained in the documents, and signed the documents. Drown communicated to the court that he had no questions for his attorney about these rights and options and orally expressed an understanding of the plea agreement and the potential sentence he faced for each count. Drown told the court that he did not have mental problems and that he had not taken any drugs or medications that might affect his ability to understand his rights or the consequences of his plea. Drown told the court that he had sufficient time to discuss his legal rights and options with his attorney, that he fully understood his legal rights and options and the consequences of his guilty plea to the charges in the case, and that he had no further questions about any of the rights, choices, or options available to him. Finally, O'Hara testified that Drown never expressed any indication that he did not understand the plea agreement. Drown is not entitled to relief under the third *Edgar* factor.

CONCLUSION

Based on the record before us, Drown is not entitled to relief under any of the *Edgar* factors. Rather, it appears that Drown has determined, in hindsight, that his plea was not the best course of action. Unfortunately for Drown, without more, there was insufficient good cause to withdraw his plea. See *Schow*, 287 Kan. at 542. As a result, the district court did not abuse its discretion in denying Drown's motion to withdraw his plea.

Affirmed.

13